UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| JONATHAN GARFINKLE, | |
| Plaintiff, | 19 Civ. _____ |
| v. | |
| | **COMPLAINT** |
| THE CONFERENCE ON JEWISH MATERIAL CLAIMS AGAINST GERMANY, INC. and GREGORY SCHNEIDER, | **JURY TRIAL REQUESTED** |
| Defendants. | |

Plaintiff Jonathan Garfinkle, by his undersigned attorneys, as and for his complaint against The Conference on Jewish Material Claims Against Germany, Inc. (the "Claims Conference") and Gregory Schneider ("Schneider" and collectively, "Defendants"), alleges as follows:

## NATURE OF THE ACTION

1. This action arises out of Defendants' intentional and malicious attempt to destroy Mr. Garfinkle's professional reputation and career.

2. Mr. Garfinkle has dedicated his career to the service of the country's less fortunate residents. Mr. Garfinkle devoted many years of his professional life to Jewish Family Service of Greater New Haven ("JFS New Haven"), serving as its Executive Director. In or about February, 2018, Mr. Garfinkle left JFS New Haven and subsequently accepted the position of Chief Operating Officer of Jewish Community Services of South Florida ("JCS Florida").

3.       Seeking to destroy Mr. Garfinkle's reputation and career, Defendants used their considerable leverage in the Jewish services community to force JCS Florida to terminate Mr. Garfinkle without any legitimate reason or explanation.

4.       Defendants took this action intentionally, maliciously and without any valid justification.

5.       Defendants' misconduct caused Mr. Garfinkle to suffer significant monetary losses and inflicted severe emotional distress on Mr. Garfinkle.  As a result of the Claims Conference and Schneider's malicious conduct, Mr. Garfinkle has been unable to find full-time employment in his chosen profession.

## PARTIES

6.       Plaintiff Jonathan Garfinkle currently resides in Woodbridge, Connecticut. During the relevant time period of the Defendants' misconduct, Mr. Garfinkle lived and worked in Miami, Florida.

7.       Mr. Garfinkle holds a Ph.D. in clinical psychology from Yale University, where he also earned a Master's Degree in psychology.  Mr. Garfinkle earned his Bachelor's Degree in psychology from Princeton University, from which he graduated *summa cum laude*.

8.       Mr. Garfinkle is a licensed clinical psychologist who has eschewed a potentially lucrative private practice in order to devote his professional career to public service.  Since at least 1998, Mr. Garfinkle has served the community in leadership roles for various non-profit human service organizations, including several Jewish Family Services organizations.

9. Throughout his professional career, Mr. Garfinkle has earned a sterling reputation for competence, integrity, commitment and compassion. He has never been accused of any professional negligence or misconduct.

10. Defendant Claims Conference is a New York not-for-profit corporation with its principal place of business in New York, New York.

11. The Claims Conference is an organization that negotiates with the government of Germany to obtain payments which it then distributes to Holocaust survivors through agencies such as JFS New Haven (the "Holocaust Program"). According to its website, the Claims Conference has paid more than $70 billion to more than 800,000 Holocaust victims since its founding in 1952.

12. Defendant Gregory Schneider is an individual currently residing in New York, New York. During the period relevant to Mr. Garfinkle's claims, Mr. Schneider was the Executive Vice President of the Claims Conference.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2) because the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because the Claims Conference's principal place of business and Schneider's residence are in the Southern District of New York.

## STATEMENT OF FACTS

**I.       The Holocaust Program**

15.     Mr. Garfinkle served as Executive Director of JFS New Haven from 2009 until in or around late February, 2018.

16.     At all times, Mr. Garfinkle faithfully and competently performed his duties as Executive Director of JFS New Haven.

17.     During the relevant period, Jewish Family Service of Greater Hartford, Inc. ("JFS Hartford") was one of the agencies through which the Claims Conference distributed funds in connection with the Holocaust Program.

18.     JFS New Haven was a subsidiary grantee to JFS Hartford, which worked with JFS Hartford to use Holocaust Program funds allocated by JFS Hartford to provide case management and other services to Holocaust survivors living in the greater New Haven area.

19.     The Holocaust Program represented only a small fraction of the services provided by JFS New Haven during Mr. Garfinkle's tenure as its Executive Director.

20.     JFS New Haven employee Joan Sloan was principally responsible for providing case management services to Holocaust survivors under the Holocaust Program and for adequately documenting her activities so that JFS New Haven could obtain reimbursement from the Claims Conference funds administered by JFS Hartford for the time she spent providing such services.

21.     During the relevant period, JFS New Haven employee Amy Rashba directly supervised Ms. Sloan's work on the Holocaust Program.

22. According to JFS New Haven's website, Ms. Rashba was promoted to the position of Chief Executive Officer ("CEO") at JFS New Haven.

23. During the relevant period, JFS New Haven's Chief Financial Officer ("CFO"), Rita Vinnitsky, was responsible for reviewing Ms. Sloan's time sheets and preparing accurate invoices to be submitted to JFS Hartford in connection with the Holocaust Program.

24. According to JFS New Haven's website, Ms. Vinnitsky remains employed by JFS New Haven as its CFO.

25. Ms. Vinnitsky worked directly with a JFS Hartford employee named Joan Margolis who was responsible for, among other things, overseeing JFS Hartford's administration of the Holocaust Program funds received from the Claims Conference.

26. According to JFS Hartford's website, Ms. Margolis remains employed by JFS Hartford as its Director of Operations and Community Programs.

27. Mr. Garfinkle never saw any JFS New Haven invoices relating to the Holocaust Program before they were sent to JFS Hartford and was not responsible for reviewing Ms. Sloan's weekly time sheets.

28. In practice, Ms. Sloan communicated directly with Ms. Margolis concerning the day-to-day administration of the Holocaust Program and the services provided thereunder at JFS New Haven.

29. Mr. Garfinkle never had any reason to believe that the individuals involved in monitoring the Holocaust Program—including Mmes. Sloan, Rashba, Vinnitsky and Margolis—

5

were not properly documenting and confirming that all invoices submitted to JFS Hartford were accurate.

## II. JFS New Haven's Audit of the Holocaust Program

30. In or about late February, 2018, Mr. Garfinkle left JFS New Haven.

31. After Mr. Garfinkle's departure, JFS New Haven began to conduct an investigation relating to JFS New Haven's administration of the Holocaust Program. JFS New Haven knew at this time that Mr. Garfinkle was not involved in—or aware of—any billing irregularities with respect to the Holocaust Program.

32. On or about Friday, April 13, 2018, Mr. Garfinkle received a letter from a lawyer representing JFS New Haven notifying him that JFS New Haven had engaged an "experienced forensic auditor" to review JFS New Haven's records and demanded that Mr. Garfinkle respond no later than the next business day (the following Monday, April 16, 2018), to confirm his availability to meet with JFS New Haven's counsel and forensic auditor between April 18-26, 2018.

33. On information and belief, JFS New Haven's investigation and audit (the "Audit") was focused on billing practices relating to Ms. Sloan's work in connection with the Holocaust Program and JFS New Haven's invoices seeking reimbursement from JFS Hartford for such work.

34. Mr. Garfinkle agreed to meet with JFS New Haven's representatives as soon as practicable.

35. On April 26, 2018, Mr. Garfinkle and his counsel met with JFS New Haven's counsel and forensic auditor for approximately three hours, during which time Mr. Garfinkle cooperated fully, answering every question put to him to the best of his knowledge and recollection.

36. During this meeting, Mr. Garfinkle made clear that he had almost no involvement in overseeing the Holocaust Program and that he relied on Ms. Vinnitsky to ensure that accurate and properly documented invoices were submitted to JFS Hartford.

37. Mr. Garfinkle also made clear that he relied on Ms. Margolis—who interacted with Ms. Sloan directly—to oversee the program on behalf of JFS Hartford and to keep him generally informed about the Holocaust Program.

38. JFS New Haven's investigation resulted in a written audit report (the "Audit Report") dated May 22, 2018.

39. Mr. Garfinkle was not asked to review the Audit Report and did not receive a copy of the Audit Report until months later.

40. JFS New Haven's counsel subsequently sent the Audit Report to Julianna Peretz, the Senior Program Officer at the Claims Conference, with an accompanying cover letter dated May 31, 2018.

41. Neither the Audit Report nor JFS New Haven's correspondence suggest any intentional misconduct by anyone in connection with JFS New Haven's administration of the Holocaust Program; rather, the Audit Report merely identifies issues relating to the

documentation for certain services provided by Ms. Sloan that were invoiced against the Holocaust Program funds being administered by JFS Hartford.

42. Neither the Audit Report nor JFS New Haven's correspondence implicate Mr. Garfinkle in any wrongdoing. In fact, the documents confirm that Mr. Garfinkle had very little involvement in overseeing the details of JFS New Haven's billing for the Holocaust Program.

43. The cover letter accompanying the Audit Report also notes that audits of JFS New Haven conducted by the Claims Conference in 2015 and 2017 did not cite any lack of documentation in connection with the Holocaust Program.

44. Mr. Garfinkle had so little involvement in the Holocaust Program that the Claims Conference's auditors did not even speak to Mr. Garfinkle during the course of these previous audits.

### III. Tortious Interference With Mr. Garfinkle's Subsequent Employment

45. After leaving JFS New Haven, Mr. Garfinkle accepted the position of Chief Operating Officer, Executive Vice President of Jewish Community Services of South Florida ("JCS Florida").

46. Mr. Garfinkle relocated to Florida and began working at JCS Florida on or about May 14, 2018 because JCS Florida offered an opportunity for advancement within the organization. Specifically, JCS Florida's CEO informed Mr. Garfinkle that he would be retiring within two years and that Mr. Garfinkle would have the inside track to take over as CEO.

47. Pursuant to his written offer letter, Mr. Garfinkle's annual salary at JCS Florida was $155,000, plus benefits.

48. JCS Florida receives approximately fifty-percent of its operating funds—almost $14 million out of a total budget of $28 million—in the form of grants from the Claims Conference.

49. The Defendants knew that if the Claims Conference withheld funds from JCS Florida, JCS Florida would be forced to substantially curtail its operations. The Claims Conference and Schneider recognize that they wield tremendous power over smaller entities like JCS Florida, which largely depend on grants from the Claims Conference to fund their operations.

50. In an effort to derail Mr. Garfinkle's new job at JCS Florida and ensure that JCS Florida terminated Mr. Garfinkle, JFS Hartford sent a series of emails to the Claims Conference regarding Mr. Garfinkle on or around July 25, 2018.

51. Initially, Ms. Margolis of JFS Hartford sent to Ms. Peretz of the Claims Conference a link to the JCS Florida webpage listing its senior staff and noted that "apparently no one was ever called for a reference from board or staff."

52. Ms. Peretz responded to Ms. Margolis on the same day, writing "Hi Joan, I'm not sure what this message means. Can you please clarify?"

53. Ms. Margolis responded promptly, writing: "That link is to a webpage from the JCS South Florida website, showing you that Jonathan Garfinkle is their new COO. They have an $8 million Claims Con budget, and we felt you should know that he is the second in command at that agency with oversight of that huge budget."

9

54. At this point in time, Ms. Peretz, the Claims Conference and Schneider were already in possession of the Audit Report and were well aware that it did not implicate Mr. Garfinkle in any wrongdoing in connection with the Holocaust Program.

55. Notwithstanding this knowledge and without conducting any further investigation into Mr. Garfinkle's role with respect to the Holocaust Program at JFS New Haven, Schneider wrote a letter to Fred Stock, Chief Executive Officer of JCS Florida, dated August 2, 2018, in order to strong-arm JCS Florida into terminating Mr. Garfinkle (the "CC Letter").

56. In the CC Letter, Schneider stated that "[b]ased upon our prior experience with another grantee agency that employed Mr. Garfinkle, the Claims Conference is unwilling to work with Mr. Garfinkle in any capacity. We therefore request that you provide us with a written assurance that, effective immediately, Mr. Garfinkle will have no interactions or responsibilities with respect to the Claims Conference 2018 grants or any future grants. This includes any and all aspects relating to the funds, grant implementation and the Claims Conference Program."

57. Defendants knew that the CC Letter would result in Mr. Garfinkle's immediate termination at JCS Florida, as the CC Letter falsely implied that Mr. Garfinkle had engaged in misconduct in connection with another grantee agency.

58. Defendants knew that Mr. Garfinkle had not engaged in any misconduct and was not directly involved in the Holocaust Program at JFS New Haven at the time of Schneider's letter.

59. When confronted by his new employer about the CC Letter, Mr. Garfinkle was shocked. No one from the Claims Conference, including Schneider, had ever contacted him about the concerns expressed in the CC Letter or otherwise offered him an opportunity to understand and rebut the basis for those concerns.

60. Mr. Garfinkle asked Mr. Stock to speak to Schneider—with whom Mr. Stock had a longstanding relationship—to get a better understanding of the concerns that led him to send the CC Letter.

61. Schneider refused to further explain the basis for the CC Letter to Mr. Stock (despite their relationship) and reiterated that he and the Claims Conference would not allow Mr. Garfinkle to have any interaction with its funds.

62. As a direct result of the CC Letter, JCS Florida terminated Mr. Garfinkle's employment on August 9, 2018. The sole reason for Mr. Garfinkle's termination was the CC Letter and the Claims Conference and Schneider's refusal to work with him.

63. After Mr. Garfinkle's termination, Defendants attempted to cover their tracks by commencing a perfunctory investigation into Mr. Garfinkle's work at JFS New Haven.

64. Defendants' refusal to work with Mr. Garfinkle has effectively blacklisted him, foreclosing his ability to continue his career with any Jewish community organization that interacts with or relies on funding from the Claims Conference.

65. Defendants knew that the CC Letter would result in Mr. Garfinkle's termination and blacklisting, and they intended those results.

66. At the time that Schneider sent the CC Letter, Defendants both knew that their supposed concerns about Mr. Garfinkle were false.

67. On information and belief, Defendants fabricated the purported concerns set forth in the CC Letter with the malicious intent of defaming Mr. Garfinkle and interfering with his employment and business relationship with JCS Florida.

**IV.        The Claims Conference and Schneider Dissemble**

68. Shocked by Defendants' unwarranted attack on his integrity and the resulting upheaval in his personal and professional life caused by the CC Letter and his subsequent termination from JCS Florida, Mr. Garfinkle attempted to resolve Defendants' unwarranted involvement in his employment.

69. On August 13, 2018, Mr. Garfinkle's counsel wrote a letter to Schneider explaining the consequences of the CC Letter and requesting a meeting to discuss Defendants' concerns before any further damage was done to Mr. Garfinkle's reputation and professional prospects.

70. Several days later, Mr. Garfinkle's counsel received a phone call from an attorney at the Proskauer law firm ("CC Counsel"), counsel for the Claims Conference.

71. CC Counsel declined the request for a meeting with Schneider and insisted that the Claims Conference had ample reasons to send the CC Letter. When asked to explain such reasons, CC Counsel referenced the Audit Report which, he contended, provided evidence that Mr. Garfinkle was aware of and/or responsible for alleged billing improprieties in connection with the Holocaust Program.

72. Despite multiple requests, CC Counsel declined to provide the Audit Report to Mr. Garfinkle and suggested that Mr. Garfinkle obtain the materials from other sources.

73. CC Counsel did provide a letter addressed to the Claims Conference, Schneider and JFS Hartford dated April 9, 2018 which was signed by Linda Caplan, JFS New Haven's President and Ms. Rashba as its Acting Executive Director.

74. This letter, which did not mention Mr. Garfinkle or accuse him of any wrongdoing, informed Defendants that JFS New Haven believed that it had "submitted inaccurate invoices to JFS [Hartford] with respect to case management work" on the Holocaust Program.

75. The April 9, 2018 letter further stated that JFS New Haven had "reason to believe that [it] billed for hours of time that Ms. Sloan did not spend on the program" and that JFS New Haven was "researching the scope of this problem."

76. Because the April 9, 2018 letter did not mention Mr. Garfinkle and merely suggested that JFS New Haven was investigating the billing issue raised in the letter, Mr. Garfinkle's counsel sought additional information from CC Counsel and again requested a copy of the Audit Report.

77. On a follow-up call with Mr. Garfinkle's counsel, CC Counsel asserted that Mr. Garfinkle was responsible for overseeing the Holocaust Program funds and that it was his obligation to ensure that all invoices and time records submitted by JFS New Haven were accurate. He reiterated Defendants' position that there was "no universe" in which Mr. Garfinkle would be allowed to work at an entity distributing Claims Conference funds again.

78. CC Counsel once again referenced the Audit Report as the basis for Defendants' position, but declined to provide Mr. Garfinkle with a copy of the Audit Report.

79. At no point did CC Counsel mention the July 25, 2018 email exchange between Ms. Margolis and Ms. Peretz or otherwise disclose that Ms. Margolis had informed the Claims Conference of Mr. Garfinkle's employment with JCS Florida or that Ms. Margolis had implied that this was cause for concern for the Claims Conference.

80. Mr. Garfinkle's counsel subsequently obtained a copy of the Audit Report.

81. After thoroughly reviewing the Audit Report and cover letter, Mr. Garfinkle's counsel wrote to CC Counsel on October 3, 2018 to point out a number of discrepancies in Defendants' position and to demand that Defendants retract the CC Letter and confirm that the Claims Conference would be willing to work with Mr. Garfinkle going forward.

82. Among other things, the October 3, 2018 letter pointed out the following discrepancies:

    a. The Audit Report does not conclude that JFS New Haven submitted "inaccurate invoices" as the Claims Conference repeatedly asserted, but rather merely cites Ms. Sloan's purported failure to maintain proper documentation to support the invoices JFS New Haven submitted to JFS Hartford in connection with the Holocaust Program;

    b. The Audit Report does not place any blame on Mr. Garfinkle for the documentation issues identified by the audit for any other problems with JFS New Haven's administration of the Holocaust Program;

    c. The Claims Conference's own audits did not reveal any concerns about JFS New Haven's documentation practices; and

    d. The Claims Conference and Schneider apparently continue to work with the individuals most closely associated with the JFS Entities'

14

     administration of the Holocaust Program, including Amy Rashba, Rita Vinnitsky and Joan Margolis.

83. These discrepancies, among other facts, demonstrate that Defendants took action against Mr. Garfinkle arbitrarily, maliciously and without any justification.

84. CC Counsel responded to the October 3rd letter in a letter dated October 18, 2018. In his letter, CC Counsel did not address any of the discrepancies noted above but instead continued to assert—without any articulated basis—that Defendants have "ample reason to believe that Mr. Garfinkle had knowledge of JFS [New Haven's] improper practices."

85. CC Counsel did not offer any explanation for the fact that Defendants continue to work with Mses. Rashba, Vinnitsky and Margolis—the individuals who actively managed the Holocaust Program for JFS New Haven and JFS Hartford—while at the same time singling out Mr. Garfinkle to be blacklisted.

86. CC Counsel's letter further stated that the Claims Conference declined to reconsider its position despite the identified discrepancies.

87. In a follow-up phone call, CC Counsel declined to provide any additional explanation of the alleged "ample reason" for Defendants' conduct towards Mr. Garfinkle and continued to rely on the Audit Report as the sole basis for its attacks on him.

88. Separately, after reviewing the Audit Report and cover letter, Mr. Garfinkle's counsel contacted counsel for JFS New Haven in a further attempt to understand the source of Defendants' concerns. JFS New Haven's counsel stated that he could not explain the apparent

15

disconnect between the results of the Audit Report and Defendants' position with respect to Mr. Garfinkle.

89. As a direct result of Defendants' actions, Mr. Garfinkle was terminated from his employment with JCS Florida which has caused him severe economic, reputational, physical and emotional harm and distress.

90. Mr. Garfinkle and his family have been devastated by the upheaval directly caused by Defendants' malicious conduct.

91. Mr. Garfinkle's sterling professional reputation has been permanently tarnished by Defendants' tortious conduct.

92. Despite his best efforts, Mr. Garfinkle has found it impossible to secure employment with any Jewish social services organization as a direct result of Defendants' conduct.

93. Mr. Garfinkle has suffered and continues to suffer substantial economic harm and insecurity as a direct result of Defendants' disparagement and tortious interference.

## CLAIM FOR RELIEF

### Count I
### (Tortious Interference with Business Relations—Against All Defendants)

94. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 93 above as if they were fully set forth herein.

95. Mr. Garfinkle and JCS Florida had a business relationship in which JCS Florida served as Mr. Garfinkle's employer.

96. Defendants knew that Mr. Garfinkle was hired by JCS Florida.

97. Defendants intentionally and improperly forced JCS Florida to terminate Mr. Garfinkle without justification.

98. Defendants acted with the intent to harm Mr. Garfinkle's career and reputation.

99. As a result of Defendants' misconduct, Mr. Garfinkle was terminated by JCS Florida and lost the benefits of his employment.

100. Mr. Garfinkle has suffered monetary damages due to Defendants' tortious conduct.

## Count II
### (Intentional Infliction of Emotional Distress—Against All Defendants)

101. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 100 above as if they were fully set forth herein.

102. Defendants' malicious interference in his employment has caused Mr. Garfinkle extreme anxiety and severe emotional distress.

103. Defendants intended, or should have known, that their tactics—including defaming Mr. Garfinkle to his new employer and maliciously strong-arming Mr. Garfinkle's employer into terminating him without reason—would cause emotional distress.

104. Defendants' conduct as described herein was extreme and outrageous.

## Count III
### (Defamation—Against All Defendants)

105. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 104 above as if they were fully set forth herein.

106. Defendants maliciously and intentionally wrote the CC Letter to JCS Florida.

107. Defendants knew that the statements in the CC Letter implicating Mr. Garfinkle were false and would damage his reputation.

108. As a result of the defamatory statements in the CC Letter, Mr. Garfinkle was terminated by JCS Florida and lost the benefits of his employment.

109. Mr. Garfinkle has suffered, *inter alia*, monetary and reputational damages due to Defendants' conduct.

### Count IV
### (Civil Conspiracy—Against All Defendants)

110. Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 109 above as if they were fully set forth herein.

111. On information and belief, Defendants had an agreement between and among themselves, JFS Hartford, and other unnamed co-conspirators, to tortiously interfere with Mr. Garfinkle's employment.

112. On information and belief, Defendants sent the CC Letter in furtherance of their agreement to tortiously interfere in Mr. Garfinkle's employment.

113. As a result of the CC Letter, Mr. Garfinkle was terminated by JCS Florida and lost the benefits of his employment.

114. Mr. Garfinkle has suffered, *inter alia*, monetary and reputational damages due to Defendants' conduct.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Garfinkle respectfully requests that this Court grant judgment in his favor and award the following relief:

A. Actual and consequential monetary damages of no less than $155,000 in an amount to be determined at trial;

B. Punitive damages and attorney's fees;

C. Money damages to compensate Mr. Garfinkle for the emotional distress he has suffered in an amount to be determined at trial;

D. A permanent injunction barring Defendants from defaming Mr. Garfinkle or interfering with his future employment;

E. Reimbursement for the fees and expenses incurred in bringing this lawsuit; and

F. Such additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Jonathan Garfinkle hereby demands a trial by jury on all issues so triable of right.

PLAINTIFF
JONATHAN GARFINKLE


By: /s/ Tony Miodonka
    Michael Q. English
    Tony Miodonka
    Six Landmark Square
    Stamford, CT  06901-2704
    Tel: (203) 325-5000
    Fax: (203) 325-5001
    E-mail: menglish@fdh.com
           tmiodonka@fdh.com